UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RENEE E., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, <br> ACTING COMMISSIONER OF SOCIAL SECURITY,[1] <br><br> Defendant. | No. 19 CV 7840 <br><br> Magistrate Judge McShain |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Renee E. brings this action under 42 U.S.C. § 405(g) for judicial review of the Social Security Administration's (SSA) decision denying her application for benefits. For the following reasons, the Court denies Plaintiff's motion for summary judgment [20],[2] grants the Acting Commissioner of Social Security's motion for summary judgment [29], and affirms the Acting Commissioner's decision denying Plaintiff's application for benefits.

**Procedural Background**

In February 2016, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of December 31, 2015. [14-1] 15. Plaintiff's claim was denied initially and on reconsideration. [*Id.*]. Plaintiff requested a hearing, which was held by an administrative law judge (ALJ) on June 6, 2018. [*Id.*]. In a decision dated November 27, 2018, the ALJ found that plaintiff was not disabled. [*Id.*] 30. The Appeals Council denied review on September 25, 2019, [21] 2, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the blue CM/ECF header placed at the top of the filings, with the exception of citations to the administrative record [14], which refer to the page numbers in the bottom right corner of each page.

& 404.981. Plaintiff timely appealed to this Court [1], and the Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).[3]

## Factual Background

Plaintiff, who was fifty-three years old at the time of the alleged onset date, [21] 2, sought benefits based on, *inter alia*, depressive disorder and mild vascular neurocognitive disorder. [14-1] 18. Before applying for benefits, Plaintiff worked as a Contact Representative for Social Security for eighteen years. [14-4] 353. On November 2015, the United States Office of Personnel Management (OPM) found that Plaintiff was "disabled for [her] position . . . due to Stroke, Depressive Disorder, PTSD, Panic Disorder, and Mild Vascular Neurocognitive Disorder." [14-4] 394. The OPM cited Plaintiff's "medical records" as the basis for finding Plaintiff disabled, but the OPM's written decision does not explain how it determined that Plaintiff was disabled. [*Id.*].

### I. Plaintiff's Vascular Neurocognitive Disorder And Related Limitations

On July 6, 2000, a day after giving birth to her son, Plaintiff suffered a stroke. [14-4] 384. Plaintiff continued to work in her position with Social Security for over a decade after this incident. *See* [21] 2.

On December 11, 2013, Plaintiff's treating physician, Dr. Latifah Sabree, referred Plaintiff for a neuropsychological/psychological evaluation. [14-5] 397. The examination was conducted in April 2014 by Dr. Jaswinder Singh. [14-4] 383. Dr. Singh tested Plaintiff's learning and memory functions and her attention and executive functions. [*Id.*] 386-87. Plaintiff "was found to have mild to marked impairment in attention and executive functioning, mild impairment in immediate memory, and moderate impairment in visual-spatial skills." [*Id.*] 389. Dr. Singh further concluded that "[Plaintiff's] cognitive impairments, particularly in attention and executive functioning, likely are caused by her stroke and support a DSM-5 diagnosis of Mild Vascular Neurocognitive Disorder." [*Id.*].

On May 11, 2016, Plaintiff was evaluated by Dr. Christine Kieffer. [14-6] 532-34. Dr. Kieffer's mental status examination found that Plaintiff's capacity for attention was mildly impaired and her capacity for concentration was markedly impaired. [*Id.*] 533. In support, Dr. Kieffer noted that Plaintiff was able to repeat five digits forward and three digits backwards. [*Id.*]. Dr. Kieffer also tested Plaintiff's fund of general information and her capacity for arithmetic calculation, abstract conceptual reasoning, and insight and social judgment. [*Id.*]. Dr. Kieffer conducted a "Serial 7s" test–in which Plaintiff was instructed to count backwards from 100 by seven–but found that Plaintiff could not complete this test. [*Id.*]. Dr. Kieffer

---

[3] The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. [9].

determined that Plaintiff's capacity for arithmetic calculation was somewhat impaired. [*Id.*]. Dr. Kieffer arrived at a final diagnosis of Major Depressive Disorder, Single Episode, Moderate. [*Id.*] 534.

In January 2018, Dr. Singh, together with Samantha Skoczylas, Psy.D., conducted another neuropsychological/psychological assessment of Plaintiff. [*Id.*] 554-60. Drs. Singh and Skoczylas found that Plaintiff had "moderate to severe impairments on Immediate Memory and Attention," "mild to moderate impairment on Executive Functioning, mild impairment on Delayed Memory, and adequate skills on Recognition Memory." [*Id.*] 558. The doctors also concluded that their findings supported a diagnosis of probable major vascular neurocognitive disorder, panic disorder, and major depressive disorder–single episode, severe. [*Id.*] 559.

## II.   Plaintiff's Mental Health

Plaintiff's medical records show a relatively consistent history of depression beginning in 2013. [14-5] 397. On December 11, 2013, Plaintiff's treating physician, Dr. Sabree, wrote a letter identifying Plaintiff's mental and medical conditions, including "stressors in her personal life including the recent death of her mother," her son's learning disability and behavioral disorder, and Plaintiff's own "anxiety at work triggered by dealing with difficult often angry customers." [*Id.*]. Dr. Sabree also noted that Plaintiff was "on medication to control her medical conditions" and that "[s]he has reported side effects" from the medications that were intended "to stabilize her emotions." [*Id.*].

Dr. Sabree's later treatment notes document depression, stress-related issues at work and at home, and memory deficits that, according to a March 13, 2015 note, had "not improved." [14-5] 422, 424, 426-30. A treatment note from January 24, 2014 did not recount any concerns regarding Plaintiff's mental limitations, but Dr. Sabree documented a complaint by Plaintiff on April 25, 2014 that she is "still with some depression." [*Id.*] 429-30. During an October 24, 2014 appointment, Dr. Sabree noted Plaintiff's issues with insomnia, PTSD, "significant cognitive challenges and emotional stressors[,]" episodes of depression, and anxiety attacks. [*Id.*] 428. Dr. Sabree's notes from April 2017 through March 2018 reflect similar findings. [14-6] 581, 588, 595; [14-7] 607. Dr. Sabree noted in the earliest of these sessions, on April 26, 2017, that Plaintiff was "still [with] issues dealing with some learning disabilities and behavior disorders." [14-7] 607. On July 10, 2017, Dr. Sabree noted that Plaintiff was "still with depression and memory loss issues;" on December 12, 2017, Dr. Sabree notes that Plaintiff "goes to Counseling and is set for reevaluation of her functional capacity;" and on March 20, 2018, Dr. Sabree noted Plaintiff was "seen by neuropsych with noted cognitive and functional deficits." [14-6] 581, 588, 595.

Regarding possible treatments for Plaintiff's mental-health issues, Dr. Sabree reported on March 13, 2015 that Plaintiff reported "too many side effects" during a

3

trial with antidepressants, and that Plaintiff had "not continued with counseling at present but will again return to individual and family counseling." [14-5] 426. However, there is no evidence in the record that Plaintiff attended counseling until September 27, 2017, when Plaintiff met with Dr. Timothy Lee. [14-7] 642. During her appointment with Dr. Lee, Plaintiff complained that she was "depressed" and "unable to work as the result of a stroke in 2000." [*Id.*]. The record reflects six subsequent sessions between Dr. Lee and Plaintiff. During one visit, Plaintiff "reiterated how stressful it was for her to be a customer service representative for the Social Security Administration, stating that when clients made complaints, they were believed over the SSA workers." [*Id.*] 646. During the other visits, Dr. Lee noted that Plaintiff discussed problems in her personal life, typically having to do with her son and husband. *See* [*id.*] 644, 648, 651, 655, 657. None of Dr. Lee's treatment notes mentioned a concern with Plaintiff's ability to concentrate, pay attention, or remember instructions.

The record also contains two written self-assessments, dated April 15, 2016 and August 8, 2016, in which Plaintiff described her mental impairments and her mental-health issues. Plaintiff described difficulties with understanding materials she had read, writing clearly and accurately, understanding others, communicating, spelling, and remembering daily tasks. [14-3] 281; [14-4] 315, 320. She also stated that she was unable to count and found it difficult to complete tasks and follow instructions. [14-3] 285; [14-4] 319-20. Plaintiff alleged that she needed to hear or read instructions several times to follow them. [14-3] 286; [14-4] 320. Plaintiff asserted that she needed to feel "up to" tasks in order to do chores, and that her depression causes her to take extra time with chores. [14-3] 283; [14-4] 317. In the community, Plaintiff went out daily by herself, walking, driving, riding in cars, and using public transportation. [14-3] 284; [14-4] 318. Plaintiff would shop in stores and/or online once or twice a month, go to movies and eat out about once a month, go to church every Sunday, and visit with family and friends. [14-3] 284-86; [14-4] 318-20. Plaintiff asserted that she did not need reminders to go places. [14-3] 285; [14-4] 319.

At the hearing before the ALJ, Plaintiff testified about the symptoms caused by her mental impairments and mental-health issues. Plaintiff testified that she experienced panic attacks and depression, [14-1] 45; emotional fits, [*id.*] 49; stress from her job that prevented her from concentrating, [*id.*] 51-52; concentration and memory issues that contributed to her decision to retire, [*id.*]; trouble focusing on doing chores due to her depression, [*id.*] 57; memory problems, [*id.*] 60; and difficulties keeping appointments and attending social events, [*id.*] 63. Asked about the frequency of her "bad days" where she could not leave the house, Plaintiff said that she experienced these "[m]aybe two days out of a month." [*Id.*] 63-64. Finally, Plaintiff testified that she experiences stress at home that can be overwhelming and cause her to "shut down." [*Id.*] at 64. Plaintiff testified that she sometimes puts off

4

thorough cleaning and washing for "three or four months sometimes" because of her depression. [14-1] 65.

### III. ALJ's Decision

The ALJ issued an unfavorable decision denying Plaintiff's claim for benefits. [14-1] 30. In her written decision, the ALJ relied on the standard, five step-analysis for deciding such claims.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of December 31, 2015. [14-1] 17. At step two, the ALJ determined that Plaintiff had severe impairments of hypertension, diabetes mellitus, obesity, osteoarthritis in and affecting her shoulders and arms, depressive disorder, and mild vascular neurocognitive disorder. [*Id.*] 18. At step three, the ALJ ruled that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. [*Id.*] 18-21. The ALJ found that the severity of Plaintiff's mental impairments did not meet or equal the criteria of listings 12.02 (neurocognitive disorders) or 12.04 (depressive, bipolar, and related disorders). [*Id.*] at 19. Here the ALJ considered whether the "paragraph B" criteria were satisfied, which requires a finding of one extreme or two marked limitations in four broad areas of functioning. [*Id.*] at 19-20. But the ALJ concluded that Plaintiff had only moderate limitations in understanding, remembering, or applying information and concentrating, persisting, or maintaining pace. [*Id.*] 20-21.

Before proceeding to step four, the ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform medium work, provided that Plaintiff could frequently perform overhead reaching bilaterally; never climb ladders, ropes, or scaffolds; never work at unprotected heights; frequently kneel, crouch, or crawl; and understand, remember, concentrate, persist, and carry out only simple instructions and work-like procedures in a low-stress environment that had few, if any, changes in the work setting and few, if any, simple, work-related decisions, free of a fast-paced environment but able to meet daily quotas, with only superficial contact with the public. [14-1] 21-22. At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work. [*Id.*] 28. Finally, at step five, the ALJ determined that jobs existed in significant numbers in the national economy that Plaintiff can perform, including unskilled occupations at the medium exertional level such as floor waxer, hospital cleaner, and store laborer. [*Id.*] 29-30. The ALJ accordingly found that Plaintiff was not disabled. [*Id.*] 30.

## Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairment; (4) whether the claimant can perform her past relevant work; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *2 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted).

## Discussion

Plaintiff argues that the ALJ's decision should be reversed on two grounds. First, Plaintiff asserts the ALJ erred by rejecting the consistent opinions of Drs. Singh, Kieffer, and Skoczylas that Plaintiff has a marked or severe limitation in her ability to concentrate and pay attention. [21] 4-10. Second, Plaintiff argues that the ALJ improperly discounted her subjective symptom allegations. [*Id.*] 10-13. For the following reasons, the Court concludes that substantial evidence supports the ALJ's decision to reject the doctors' opinions that Plaintiff had a marked limitation in her ability to concentrate and pay attention, and that the ALJ reasonably concluded that Plaintiff's limitation was only mild to moderate. The Court further concludes that the ALJ's analysis of Plaintiff's subjective symptom allegations was not patently erroneous and supported by substantial evidence that Plaintiff pursued only conservative treatment for her conditions and remained capable of independently completing many activities of daily life.

**I. Substantial Evidence Supports The ALJ's Weighing Of Dr. Kieffer's, Dr. Singh's, And Dr. Skoczylas's Opinions**

"An ALJ has an obligation to evaluate every medical opinion and explain the weight given to the opinion." *Georgios A. v. Kijakazi*, No. 20-cv-2729, 2022 WL 1004249, at *5 (N.D. Ill. Apr. 4, 2022) (internal quotation marks omitted). "When evaluating a medical opinion, an ALJ considers the following: (1) Supportability used by the medical source to support his opinion; (2) Consistency of the medical opinion with the other evidence in the record; (3) Relationship with the claimant, including the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship; (4) Specialization of the medical source; and (5) Other factors that tend to support or contradict a medical opinion." *Id.*, at *5-6 (internal quotation marks omitted); *see* 20 C.F.R. § 404.1527(c).

"An ALJ is required to consider a consultative examiner's opinion and explain the weight given to such an opinion in his decision." *Todd B. v. Kijakazi*, No. 20 CV 6888, 2022 WL 2132542, at *5 (N.D. Ill. Jun. 14, 2022) (internal quotation marks omitted). But the ALJ need only "minimally articulate its reasons for discounting non-treating sources' opinions," and the ALJ "need not consider explicitly every factor listed under § 404.1527(c)." *Grotts v. Kijakazi*, 27 F.4th 1273, 1277 (7th Cir. 2022). The ALJ "may discount the opinion of a consultative examiner . . . as long as he provides good reasons for doing so." *Id.* (internal quotation marks omitted).

**A. The ALJ Reasonably Concluded That Dr. Kieffer's Opinion Was Entitled To Moderate Weight.**

Dr. Kieffer performed a mental status evaluation of Plaintiff in May 2016 and found that Plaintiff's capacity for attention was mildly impaired and her capacity for concentration was markedly impaired. [14-6] 532-33. In her decision rejecting Plaintiff's claim, the ALJ gave moderate weigh to Dr. Kieffer's opinions but specifically rejected her opinion that Plaintiff's capacity for concentration was markedly impaired:

> The consultative examiner, Christine Kieffer, Ph.D., ABPP opined in May 2016 that the claimant has a mildly impaired capacity for attention and a markedly impaired capacity for concentration, noting that the claimant has a somewhat impaired capacity for arithmetic calculations, fair general fund of information, and good capacities for abstract conceptual reasoning and for insight and social judgment (6F/3). The undersigned gives moderate weight to this opinion. The undersigned finds that a markedly impaired capacity for concentration is not supported by the objective medical evidence or by Dr. Kieffer's own examination noting arithmetic calculation issues. Although Dr. Kieffer's noted limitations are otherwise generally consistent with and supported

7

by the objective medical evidence of record, the undersigned agrees with the state psychiatric consultants that additional limitations are supported–for instance, as to interaction with the public–by the objective medical evidence, including therapy notes received after the consultants completed their review and after Dr. Kieffer completed her examination (13F).

[14-1] 26.

Plaintiff argues that the ALJ's weighing of Dr. Kieffer's opinion was erroneous because the ALJ incorrectly believed that Kieffer's testing–specifically the Serial 7s test–was designed to gauge Plaintiff's arithmetic skills, not her concentration. [21] 7. Plaintiff also contends that the ALJ failed to identify the objective medical evidence that was inconsistent with Dr. Kieffer's opinion. [*Id.*]. The Acting Commissioner responds that the ALJ reasonably concluded that Plaintiff's inability to complete the Serial 7s test was insufficient to show a markedly limited ability to concentrate. [30] 9. The Acting Commissioner also contends that the ALJ's decision was supported by the opinions of the state psychiatric consultants, who found that plaintiff had only moderate difficulties with concentration. [*Id.*] 8-9. Finally, the Acting Commissioner argues that the ALJ's reference to objective evidence refers to the ALJ's earlier discussion of the medical record, where the ALJ found that Plaintiff did not see any mental-health provider for treatment until at least September 2017, the focus of this treatment was primarily on Plaintiff's relationship with her spouse, and the treatment records do not describe difficulties with concentration. [*Id.*] 9.

The Court agrees with the Commissioner that the ALJ's reasons for rejecting Dr. Kieffer's opinion are supported by substantial evidence.

First, the record refutes Plaintiff's claim that the ALJ did not understand that the Serial 7s test was a test of concentration. [21] 7. As the cases recognize, performance on the Serial 7s test "does not test for the ability to perform basic math, but instead tests for the ability to sustain focused attention and concentration." *Shaw v. Berryhill*, No. 1:16-cv-285-LF, 2017 WL 4119617, at *5 (D.N.M. Sept. 15, 2017). But the ALJ was well-aware of this fact: she specifically discussed Plaintiff's performance on the Serial 7s test in the section of her decision where she evaluated the severity of Plaintiff's limitation in "concentrating, persisting, or maintaining pace[.]" [14-1] 20.

Second, it is true that the ALJ did not specifically identify the objective evidence that she believed was inconsistent with Dr. Kieffer's opinion. When the ALJ's decision is read as a whole, however, it is clear that the ALJ was referring to her previous discussion of the treatment record pertaining to plaintiff's mental impairments and mental health. *See Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) ("The court applies a common-sense reading to the entirety of an ALJ's

8

decision."); *Victor M. v. Kijakazi*, No. 20-cv-7073, 2022 WL 2105893, at *8 (N.D. Ill. Jun. 10, 2022) (courts should give ALJ's decision "a commonsensical reading rather than nitpicking at it"). Earlier in her decision, the ALJ reviewed the records of Plaintiff's treatment with Dr. Sabree and Dr. Lee and explained that Plaintiff had not sought mental-health treatment until September 2017–nearly two years after her alleged onset date–and that the focus of this treatment appeared to be on Plaintiff's relationship with her husband. The ALJ also observed that Dr. Lee's treatment notes "do not describe or disclose any more general difficulty with interpersonal relationships, nor were difficulties with understanding, remembering, and applying information or concentrating, persistence, and maintaining pace noted by either the claimant or this doctor[.]" [*Id.*]. Given the lack of any treatment notes from Dr. Sabree or Dr. Lee documenting a marked limitation in Plaintiff's ability to concentrate, it was reasonable for the ALJ to conclude that Dr. Kieffer's opinion was inconsistent with the objective evidence.[4] *Cf. Victor M.*, 2022 WL 2105893, at *8 (affirming ALJ's ruling that plaintiff's allegations about severity of physical symptoms were not credible where ALJ "observed that medical records from 2018 and 2019 dealt almost exclusively with Plaintiff's mental impairments, not his physical impairments").

Third, in evaluating a consultative examiner's opinion, an ALJ must consider the "[s]upportability used by the medical source to support his opinion." *Georgios A.*, 2022 WL 1004249, at *5. Here, the ALJ found that Dr. Kieffer's report did not support her opinion that Plaintiff's ability to concentrate was markedly impaired. [14-1] 26. In the Court's view, this was a reasonable critique to make of Dr. Kieffer's report, as there is very little information in the report–whether by way of test results or narrative explanation–to justify a marked, as opposed to a mild or moderate, limitation in concentration. For example, Dr. Kieffer wrote that Plaintiff's "capacity for concentration was markedly impaired: she was able to repeat 5 digits forward and 3 digits backward." [14-6] 533. But there is no narrative discussion of this (or any other) test result that links it to a marked limitation. And while Dr. Kieffer also observed that Plaintiff could not complete the Serial 7s test, she did not explain why or how that failure translated to a marked limitation in the ability to concentrate or pay attention. In the absence of a more complete explanation of how and why Dr. Kieffer determined that Plaintiff's ability to concentrate was markedly limited, the ALJ could reasonably have found Kieffer's opinion to be unsupported.

For these reasons, the Court rejects Plaintiff's argument that the ALJ erred by rejecting Dr. Kieffer's opinion that Plaintiff's capacity for concentration was markedly impaired.

---

[4] The opinions of the state psychiatric consultants are also fairly encompassed by the ALJ's reference to the objective medical record. Both agency reviewers, Dr. Kirk Boyenga and Dr. David Voss, found that Plaintiff had only a moderate limitation in the ability to maintain attention and concentration for extended periods. [14-1] 26.

### B. The ALJ Reasonably Gave Slight Weight To Dr. Singh And Dr. Skoczylas's 2018 Opinions.

Dr. Singh and Dr. Skoczylas evaluated Plaintiff in January 2018 and opined that Plaintiff had a "moderate to severe impairment on Immediate Memory and Attention" and a "mild to moderate impairment on Executive Functioning." [14-6] 62. After reciting the opinions discussed in their report, the ALJ explained why she gave only "slight weight" to Dr. Singh and Skoczylas's opinions:

> The undersigned gives only slight weight to these opinions, as the medical evidence of record does not support the levels of limitation espoused in such opinions. Beyond conducting testing, it does not appear that Dr. Singh or Dr. Skoczylas had a personal treatment relationship with the claimant, such that it is unclear whether these doctors are aware of the claimant's reports that she has generally been able to function independently. Additionally, these doctors indicated they relied at least in part on a purported psychological intake by "Dr. Gopal" in September 2017 (10F/2), but "Dr. Gopal" does not otherwise appear in the claimant's longitudinal medical record at any relevant time. Finally, the undersigned finds the January 2018 opinion internally inconsistent in that it reports the claimant is independent in most activities of daily living but at the same time allegedly suffers substantial limitations due to her mental impairments.

[14-1] 27.

Plaintiff argues that the ALJ erred in rejecting Drs. Singh and Skoczylas's opinion that Plaintiff's mental functioning was severely limited. First, Plaintiff contends that the ALJ not only failed to identify what medical evidence in the record was inconsistent with this opinion, but also ignored the fact that Dr. Singh and Dr. Skoczylas's opinion was based on objective testing. [21] 8. Second, Plaintiff argues that the ALJ's reasoning was "self-contradictory" because the ALJ both "suggested that the doctors were unaware of the fact that [Plaintiff] has performed many daily activities independently" and "held it against them that they report that [Plaintiff] is independent in most activities of daily living[.]" [*Id.*]. Third, Plaintiff faults the ALJ for citing "no evidence or authority for her lay suggestion that an individual cannot be both severely limited in mental functioning and also independent in her daily activities." [*Id.*] 8-9. Fourth, Plaintiff contends that whether the record contains any records from Dr. Gopal is irrelevant because Drs. Singh and Skoczylas "based their conclusions primarily on objective test results the ALJ ignored." [*Id.*] 9. The Acting Commissioner responds that it was reasonable for the ALJ to give only slight weight to Dr. Singh and Skoczylas's opinions because the ALJ found that Plaintiff's "admitted independence in activities of daily living conflicted with [their] opinion that her capacity for concentration, persistence, or pace was extremely limited." [30] 5.

10

The Acting Commissioner also contends that Plaintiff's argument that the ALJ cited no authority for her conclusion that a claimant cannot be independent in her activities of daily life and severely limited in her mental functioning "implies it was the ALJ's burden to prove that Ellis was not as severely limited as she alleged." [*Id.*] 5. Finally, the Acting Commissioner argues that the ALJ repeatedly acknowledged that Dr. Singh and Dr. Skoczylas's opinion was based on objective testing, and that the ALJ reasonably concluded that their opinion was inconsistent with the treatment record. [*Id.*] 7-8.

The Court agrees with the Acting Commissioner that substantial evidence supports the ALJ's decision to reject Dr. Singh and Dr. Skoczylas's opinion that plaintiff had a severe impairment in attention and memory.

First, as was true of the ALJ's weighing of Dr. Kieffer's opinion, it was reasonable for the ALJ to contrast Dr. Singh and Dr. Skoczylas's opinion with the treatment record generated by Dr. Sabree and Dr. Lee, which did not document concerns about Plaintiff's markedly limited attention or concentration. Instead, Plaintiff's treatment with Dr. Lee–which did not begin until September 2017, nearly two years after the alleged onset date, and even longer after Dr. Sabree first noted issues with Plaintiff's mental health in 2013–focused on her relationship with her husband. Plaintiff is correct that the ALJ did not expressly say that, by "medical evidence of record," she meant the medical evidence of record from Plaintiff's primary-care physician and a psychologist who frequently treated Plaintiff. But the Court rejects Plaintiff's invitation to ignore the ALJ's discussion of this evidence "simply because it appears elsewhere in the [ALJ's] decision." *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015). An ALJ need only "minimally articulate" her "reasons for discounting non-treating sources' opinions," *Grotts*, 27 F. 4th at 1277, and the ALJ's statement that "the medical evidence of record does not support the level of limitation" in Dr. Singh and Dr. Skoczylas's report constitutes such a minimal articulation of her reasons for discounting their opinions.

Second, the Court rejects Plaintiff's argument that the ALJ's reasoning was "self-contradictory." According to Plaintiff, it was improper for the ALJ to first discount Singh and Skoczylas's opinion because they did not have a treating relationship with Plaintiff, such that it was "unclear whether these doctors are aware of the claimant's reports that she has generally been able to function independently," [14-1] 27, but also conclude that their opinion deserved less weight because it was inconsistent with Plaintiff's reported independence in most activities of daily living. But the Court does not believe that there is anything contradictory in this reasoning, especially when the ALJ's decision is given a "common-sense reading." *Winsted*, 923 F.3d at 478. To begin, it was proper for the ALJ to consider the lack of a treating relationship between Plaintiff and Dr. Singh and Dr. Skoczylas. *See* 20 C.F.R. § 404.1527(c)(2) ("we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a

11

detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations"). It was also fair to infer that, given the lack of a treating relationships, these doctors would have been unaware of the extent to which Plaintiff reported that she was independent in her activities of daily living. Finally, the ALJ properly considered the mismatch between Plaintiff's statements to Singh and Skoczylas that she is independent in areas such as "handle her finances," "tak[e] own medications," "mode of transportation," and "most activities of daily living," and the doctors' opinion that Plaintiff had a severe limitation in memory and attention. [14-6] 558. Read as whole, then, the ALJ's decision reflects the ALJ's reasonable conclusion that, while Drs. Singh and Skoczylas had only a limited understanding of how Plaintiff's mental limitations affected her activities of daily living, even that limited knowledge–which included Plaintiff's own statement that she was "independent in most activities of daily living"–was inconsistent with a marked limitation in memory and attention.

Third, the Court agrees with the Acting Commissioner that Plaintiff is effectively reversing the burden of proof–and misrepresenting the ALJ's decision–in arguing that the ALJ was required to cite "evidence or authority for her lay suggestion that an individual cannot be both severely limited in mental functioning and also independent in her daily activities." [21] 8-9. As in every Social Security case, here "the burden was on [Plaintiff] to explain why she was disabled as a result of her" mental impairments. *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013). But, for the reasons discussed above, the ALJ reasonably concluded that Plaintiff had not met that burden and cited substantial evidence in the record to support that decision. Furthermore, the ALJ did not make a "lay suggestion" that a claimant cannot have severe mental limitations while also being independent in her activities of daily life. To the contrary, the ALJ rejected Dr. Singh and Dr. Skoczylas's opinion that Plaintiff had severe mental limitations–not only because of Plaintiff's own reported independence in her daily life, but also because the broader treatment record did not document severe limitations in her ability to concentrate and pay attention.

Finally, no reversible error occurred when the ALJ rejected Dr. Singh and Dr. Skoczylas's opinion for the additional reason that it was based in part on a 2017 intake evaluation by Dr. Gopal, who, aside from this intake evaluation, does not appear in Plaintiff's medical records. Singh and Skoczylas's report reflects that they obtained certain "Background Information" about Plaintiff–such as the history of her present problem, her past psychiatric history, and her medical history–from a psychological intake that Gopal performed in September 2017. [14-6] 555 (internal emphases omitted). It is also apparent that Singh and Skoczylas based their opinions largely, if not entirely, on the testing that they conducted, and not on Dr. Gopal's

12

intake evaluation. *See* [*id.*] 556-60.[5] Had the ALJ rejected Dr. Singh and Dr. Skoczylas's opinions solely because the doctors had relied in part on Dr. Gopal's evaluation, the Court would be presented with a different question. But given that the ALJ had a substantial evidentiary basis to reject their opinions on the other valid grounds discussed above, any error in this regard does not justify reversing the ALJ's decision.

For these reasons, the Court finds that substantial evidence supports the ALJ's decision to reject Dr. Singh and Dr. Skoczylas's opinion that Plaintiff's memory and attention was severely limited.

### C. The ALJ's Failure To Address Dr. Singh's 2014 Evaluation Was Harmless.

Dr. Singh also evaluated Plaintiff in April 2014 and found that Plaintiff had "mild to marked impairment in attention and executive functioning[.]" [14-4] 389. The ALJ gave "little weight" to Dr. Singh's 2014 opinions because they were "so remote in comparison to the claimant's alleged onset date of December 31, 2015 that they are of little value in determining any limitations in the claimant's abilities to perform basic work activities during the relevant time period." [14-1] 28.

The Court agrees with Plaintiff that the ALJ erred by rejecting Dr. Singh's 2014 opinion solely because it predated Plaintiff's alleged onset date. "[M]edical evidence predating a claimant's onset date is not categorically irrelevant to a finding of disability. To the contrary, the ALJ must consider all evidence in the case record when [she] makes a determination or decision whether the claimant is disabled, including evidence that predates a claimant's alleged onset date." *Maria P. v. Kijakazi*, No. 19 CV 3477, 2022 WL 1523639, at *4 (N.D. Ill. May 13, 2022) (internal citations and quotation marks omitted). "Whether medical records or opinions predate the claimant's alleged onset date is something the ALJ can consider, but that fact alone does not automatically render them outdated." *Id.* (internal quotation marks omitted).

Nevertheless, the ALJ's failure to consider Dr. Singh's 2014 opinion was harmless error. "[T]he harmless error standard applies to judicial review of administrative decisions," and a court "will not remand a case to the ALJ for further specification where [the court is] convinced that the ALJ will reach the same result." *Butler v. Kijakazi*, 4 F.4th 498, 504 (7th Cir. 2021) (internal quotation marks omitted). "In assessing whether an error is harmless, [the court] examine[s] the record to determine whether [it] can predict with great confidence what the result of

---

[5] Contrary to Plaintiff's argument, it is obvious that the ALJ understood that Dr. Singh and Dr. Skoczylas's opinions were based on objective testing. *See* [14-1] 27 ("*Beyond conducting testing*, it does not appear that Dr. Singh or Dr. Skoczylas had a personal treatment relationship with the claimant[.]") (emphasis added).

13

remand will be." *Id.* (internal quotation marks omitted). Here, the Court has "great confidence" that the ALJ would reject Dr. Singh's 2014 opinion because the ALJ rejected substantively identical opinions rendered by Dr. Singh (with Dr. Skoczylas) in 2018 and by Dr. Kieffer in 2016. That is, the ALJ found that these doctors' opinions that plaintiff was severely limited in concentration, memory, and attention were inconsistent with the medical record as a whole, contrary to Plaintiff's reported independence in her activities of daily living, and, in Dr. Kieffer's case, unsupported by the doctor's own report. In these circumstances, the Court believes that the ALJ would likewise give little weight to Dr. Singh's 2014 opinions, which–like his 2018 opinions–are inconsistent with the treatment records from Dr. Sabree and Dr. Lee, which did not document concerns with Plaintiff's concentration and attention, and Plaintiff's professed independence in "most" areas of daily living.

Finally, the Court rejects Plaintiff's argument that Singh's 2014 opinion should have received even more weight because it "formed at least part of the basis for" the OPM's determination that Plaintiff was disabled from working in her former job as a Social Security customer representative. [21] 10. In 2015, OPM found that Plaintiff was disabled "due to Stroke, Depressive Disorder, PTSD, Panic Disorder, and Mild Vascular Neurocognitive Disorder." [14-4] 394. However, the OPM's letter did not explain how OPM determined that Plaintiff was disabled or what medical evidence supported its determination. *See* [*id.*].

Applicable Social Security regulations state that "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered." SSR 06-03p, 2006 WL 2329939, at \*6 (Aug. 9, 2006). An ALJ "should explain the consideration given to these decisions in the notice of decisions for hearing cases and in the case record for initial and reconsideration cases." *Id.*, at \*7. At the same time, the regulations also provide that "[a] decision by . . . any other governmental agency about whether you are disabled . . . is based on [that agency's] rules and is not [SSA's] decision." 20 C.F.R. § 404.1504. Accordingly, "[b]ecause the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, [the SSA is] not bound by disability decisions by other governmental and nongovernmental agencies." *Id.*; *see also* 20 C.F.R. § 404.1504 ("[A] determination made by another agency that [someone is] disabled . . . is not binding on [the ALJ].").

Given these regulations, the ALJ erred by not considering and discussing the OPM's decision. That said, the Court is firmly convinced that this error, too, was harmless. Most importantly, the OPM decision does not explain how it determined that Plaintiff was disabled or what medical evidence justified its decision; it does not even identify the criteria that needed to be met for the agency to find that Plaintiff was disabled. All that can be discerned from the OPM's decision letter is that the agency considered that Plaintiff had been diagnosed with having a stroke, depression, PTSD, panic disorder, and mild vascular neurocognitive disorder. [*Id.*]. To the extent

14

that OPM relied on the mere fact that Plaintiff had been diagnosed with these conditions, the Court observes that diagnoses alone are not a sufficient basis on which to find that a Social Security claimant is disabled. *See, e.g., Mitchel A. v. Saul*, No. 19 CV 1757, 2020 WL 2324425, at *6 (N.D. Ill. May 11, 2020) (recognizing that a "diagnosis alone and its potential impact do not demonstrate that [a claimant] is significantly limited in his ability to perform basic work"); *Collins v. Barnhart*, 114 F. App'x 229, 234 (7th Cir. 2004) ("Although scleroderma and Raynaud's phenomenon can cause the degree of pain and limitations that Collins asserted in her testimony, the existence of these conditions alone does not prove that the conditions so functionally limited her as to rendered her completely disabled during the relevant period.").

For all these reasons, the Court concludes that the ALJ's failure to address Dr. Singh's 2014 opinions and the OPM's disability determination was harmless error.

\* \* \*

In sum, the ALJ reasonably explained why she gave moderate weight to Dr. Kieffer's 2016 opinions and slight weight to Dr. Singh and Dr. Skoczylas's 2018 opinions. Substantial evidence supported the ALJ's decision to reject the doctors' opinions that Plaintiff had marked or severe mental limitations. And the ALJ's failure to consider Dr. Singh's 2014 opinion and OPM's unexplained finding that Plaintiff was disabled was harmless error. In so concluding, the Court recognizes that another ALJ might reasonably have concluded that Dr. Singh's, Dr. Skoczylas's, and Dr. Kieffer's opinions should have received more weight because they were based on generally consistent findings made over a four-year period. But this Court is "not free to replace the ALJ's estimate of the medical evidence with its own . . . and must uphold the decision even where reasonable minds can differ over whether [the claimant] is disabled." *Linda T. v. Saul*, No. 19 CV 3950, 2020 WL 5210846, at *4 (N.D. Ill. Sept. 1, 2020) (internal quotation marks omitted).

## II. The ALJ's Subjective Symptom Analysis Was Not Patently Wrong.

"An ALJ's findings concerning the intensity, persistence, and limiting effect of a claimant's symptoms must be explained sufficiently and supported by substantial evidence." *Frank R. v. Kijakazi*, No. 19 CV 3223, 2021 WL 4264386, at *11 (N.D. Ill. Sept. 20, 2021). "When assessing a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations." *Charles B. v. Saul*, Case No. 19 C 1980, 2020 WL 6134986, at *6 (N.D. Ill. Oct. 19, 2020). Where the ALJ "point[s] to specific findings and evidence to support her credibility determination," it is "not [the court's] place to second-guess it." *Morrison v. Saul*, 806 F. App'x 469, 474 (7th Cir. 2020). An

ALJ's subjective symptom analysis cannot be disturbed unless it is "patently wrong," meaning it "lack[s] any explanation or support." *Frank R.*, 2021 WL 4264386, at *11.

The ALJ recognized that Plaintiff alleged that she experienced difficulties with understanding reading materials, writing clearly and accurately, understanding others, communicating, and remembering daily tasks; she also recognized that Plaintiff claimed to feel overwhelmed and depressed. [14-1] 22. The ALJ further noted that Plaintiff alleged difficulties with comprehending instructions and claimed that she needed to "hear or read instructions up to several times in order to follow them." [*Id.*]. But the ALJ found that, despite Plaintiff having "been afflicted with a large number of medical conditions during the relevant timeframe," Plaintiff's providers "have generally treated [her] severe impairments conservatively, and the record shows that the claimant has continued to complete many activities of daily living on an independent basis." [*Id.*] 23. The Court concludes that substantial evidence supports these findings, and that the ALJ's subjective symptom analysis was not patently wrong.

First, the record supports the ALJ's determination that Plaintiff's impairments have been treated conservatively. Despite experiencing mental-health issues as early as 2013, and notwithstanding her December 2015 onset date, plaintiff did not pursue therapy until September 2017. *See* [14-7] 642. Even then, as the Court has already discussed, the focus of Plaintiff's treatment was on her relationships with her husband, rather than any issues with her memory, concentration, or broader ability to manage interpersonal relationships. *See* [14-7] 642, 644, 646, 648, 651, 655, 657. In a similar vein, Dr. Singh recommended in 2018 only that Plaintiff continue with therapy and have occasional neuropsychological follow-ups. *See* [14-6] 559-60. Finally, the ALJ observed that Plaintiff's doctors documented her subjective reports that some of her medications caused adverse side effects. *See* [14-5] 426. This evidence permitted the ALJ to find that Plaintiff's treatment was generally conservative and inconsistent with Plaintiff's allegations of disabling mental limitations. *See Regina P. v. Saul*, No. 19 CV 3155, 2020 WL 4349888, at *5 (N.D. Ill. July 29, 2020) ("The court will not substitute its judgment for that of the ALJ's as to what constitutes conservative treatment . . . especially where [the claimant] has not pointed to evidence undermining the ALJ's characterization of her treatment or explain[ed] why she did not seek other forms of treatment.").

Plaintiff responds that the ALJ's reasoning was flawed because, in finding that Plaintiff received only conservative treatment, it is unclear if the ALJ "was faulting [Plaintiff] for not pursuing more aggressive treatment or simply remarking on the treatment her providers deemed prudent[.]" [21] 11. But giving the ALJ's decision a common-sense reading, *see Winsted*, 923 F.3d at 478, the Court cannot agree that the ALJ was "faulting" Plaintiff for anything. Rather, the ALJ was permissibly contrasting the limited treatment Plaintiff obtained for her mental impairments and mental-health issues with her allegations that those impairments and issues

16

rendered her disabled. *See, e.g.*, SSR 16-3, 2016 WL 1119029, at *8 (Mar. 16, 2016) ("if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record"). Plaintiff faults the ALJ for failing to consider possible reasons why she did not pursue additional treatment, but the only reason that Plaintiff identifies–her past adverse reactions to psychiatric medications, *see* [21] 11– was expressly acknowledged by the ALJ, *see* [14-1] 25 ("Additionally, the medical records reflect complaints of side effects secondary to prior (before the alleged onset date) use of antidepressant medications.").[6]

Second, the record supports the ALJ's finding that Plaintiff's complaints of disabling mental limitations were inconsistent with substantial evidence that Plaintiff was independent in many activities of daily life.

An ALJ "is allowed to consider whether the claimant's daily activities are inconsistent with her stated inability to work." *Oakes v. Astrue*, 258 F. App'x 38, 43 (7th Cir. 2007) (citation omitted). This does not mean the ALJ can infer a claimant's ability to work solely from her daily activities; on the contrary, "[t]he Seventh Circuit has cautioned that a person's ability to perform daily activities does not necessarily translate to an ability to work full-time, especially if the daily activities can only be done with significant limitations." *Poff v. Saul*, No. 1:20-CV-214-JD, 2021 WL 2821169, at *3 (N.D. Ind. Jul. 7, 2021). Here the ALJ found that Plaintiff "goes out daily and can do so alone; she walks, drives, rides in a car, and uses public transportation"; "she shops in store and/or online once or twice each month;" and "she goes to the movies and eats out about once a month, goes to church each Sunday, and visits with family and friends." [14-1] 23. The ALJ further emphasized that "when Plaintiff is 'up to it,' she cleans, does laundry, and irons, although she indicates her depression causes this to take extra time." [*Id.*]. Finally, the ALJ pointed to Plaintiff's own statement that she "does not need to be reminded to go places." [*Id.*]. Given the ALJ's detailed discussion of Plaintiff's activities of daily living, the Court finds no merit in Plaintiff's argument that the ALJ's analysis was impermissibly opaque because she did not identify which activities of daily life were inconsistent with her symptom allegations. *See* [21] 12. It is plain from a common-sense reading of the decision that the ALJ was incorporating her discussion of Plaintiff's activities of daily living, which was contained in the paragraph immediately preceding the ALJ's credibility finding. *See* [14-1] 22-23.

The Court owes "special deference" to the ALJ's credibility determination, and it may overturn an adverse credibility determination only if it "lacks any explanation

---

[6] The ALJ also recognized Plaintiff's testimony that she had been prescribed "depression medications" by Dr. Sabree, but observed that "evidence of this does not appear in the record." [14-1] 25.

17

or support." *Victor M.*, 2022 WL 2105893, at *8. Here the ALJ adequately explained why she did not credit Plaintiff's allegations regarding the severity of her mental limitations and cited substantial evidence to support of her ruling. Consequently, the Court has no basis to overturn the ALJ's ruling that Plaintiff's allegations were inconsistent with the objective medical evidence in the record and her professed independence in many areas of daily life.

## Conclusion

For the reasons set forth above, Plaintiff's request to reverse the SSA's decision and remand this case to the agency [20] is denied, the Acting Commissioner's motion for summary judgment [29] is affirmed, and the Acting Commissioner's decision denying Plaintiff's application for benefits is affirmed.

_____
**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: August 19, 2022**